**NATIONAL ASSOCIATION OF HOME BUILDERS et al., Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS et al., Defendants.**

No. CIV.00–379(RJL).

United States District Court, District of Columbia.

Nov. 24, 2003.

Rafe Petersen, Lawrence R. Liebesman, Rafe Petersen, Holland & Knight, L.L.P., Washington, DC, Virginia Swisshelm Albrecht, Hunton & Williams, Washington, DC, for Plaintiffs.

Christopher Peak, U.S. Department of Justice, Washington, DC, Eileen T. McDonough, Martin F. McDermott, Silvia Sepulveda–Hambor, Department of Justice, Environment & Natural Resources Division, Washington, DC, for Defendants.

*Memorandum Opinion and Order*

LEON, District Judge.

Before the Court are the parties' cross-motions for summary judgment. In these three consolidated cases, the plaintiffs[1] challenge nationwide permits ("NWPs") issued under Section 404(e) of the Clean Water Act ("CWA") by the defendant U.S. Army Corps of Engineers ("Corps") in March 2000 and January 2002. After considering the parties motions and the opposition thereto, the Court dismisses the plaintiffs' claims for lack of jurisdiction because the agency action setting NWPs is not a final agency action subject to review.

## I. Background

Congress enacted the Clean Water Act ("CWA") to "restore and maintain the chemical, physical, and biological" of the nation's waters. 33 U.S.C. § 1251(a). To that end, the CWA prohibits a party from discharging pollutants, such as dredged or fill material, into navigable waters of the United States. *Id.* § 1311(a). Under the CWA, however, the U.S. Army Corps of Engineers ("Corps") is authorized to allow such discharges through the issuance of permits, both general and individual. *Id.* § 1344. The purpose of general permits, including nationwide permits ("NWPs"), issued under CWA Section 404(e) is to allow projects that cause minimal environmental impact to go forward with little delay or paperwork. 33 C.F.R. § 330.1(b) (explaining that general permits are "designed to authorize with little, if any, delay or paperwork certain activities having minimal impacts"). If a proposed activity meets the conditions for general permits, it need not subject itself to the individual permit process through which the Corps makes de-

---

1. The plaintiffs in this case are the National Association of Home Builders ("NAHB"), the National Stone, Sand and Gravel Association ("NSSGA"), the American Road and Transportation Builders Association ("ARTBA"), the Nationwide Public Projects Coalition ("NPPC"), the National Federation of Independent Business ("NFIB"), and Wayne Newman.

terminations on a case-by-case basis. 33 U.S.C. § 1344. Specifically, Section 404(e) states that

> the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.

*Id.* § 1344(e)(1). Thus, the Corps has the discretion to issue such general permits if the polluting activities are similar in nature and will only cause minimal environmental effects. *Id.* If a party discharges pollutants into navigable water without meeting the conditions of a general permit or otherwise acquiring an individual permit, then the party can be subject to enforcement actions, such as a civil administrative action by the Corps or a civil and criminal proceeding by the Department of Justice. *Id.* § 1319(g); 33 C.F.R. §§ 326.5, 326.6.

For five-year intervals since 1977 the Corps has been issuing NWPs, including the most widely used permit, NWP 26. 61 Fed.Reg. 65,893.[2] Before the 2000 changes to the NWPs at issue in this litigation, NWP 26 authorized discharges affecting up to ten acres of waters without a party having to acquire an individual permit, and required that a party notify a Corps' district engineer of any discharges causing loss or substantial adverse modifi-

cation of one to ten acres of wetlands (this second requirement is known as a "preconstruction notification"). On June 17, 1996, the Corps proposed reissuing many of the NWPs, including NWP 26, which was to expire on January 21, 1997. On December 13, 1996, the Corps reissued NWP 26 for a period of two years, with somewhat different conditions. 61 Fed.Reg. 65,874, 65,877, 65,891, 65,895. In July 1998, the Corps published its proposed replacement permits, and extended the term of NWP 26 again. 63 Fed.Reg. 36,040. Following a public comment period in which it received 10,000 comments on the proposal, the Corps issued the final NWP 29 in August 1999, 64 Fed.Reg. 41,175, and set forth a second proposal regarding the other new permits in July 1999. 64 Fed.Reg. 39,252. On March 9, 2000, after considering even more comments, the Corps issued the permits that replaced NWP 26. 65 Fed.Reg. 12,818.

Overall this process resulted in five new NWPs (known collectively as "Replacement Permits"), modification of seven NWPs, two new General Conditions ("GCs"), and modification of nine existing GCs. These changes to the NWPs process authorized many of the same activities allowed under NWP 26, but the new and modified NWPs were activity-specific. 65 Fed.Reg. 12,818. Among the controversial changes, the Corps narrowed the maximum per-project acreage impact at a half of an acre instead of ten acres, and preconstruction notification was required for impacts greater than one-tenth of an acre instead of one acre.[3] The new NWPs be-

---

**2.** In 1995, NWP 26 was used to authorize 13,837 activities. 61 Fed.Reg. at 65,893.

**3.** Other changes include the following:

(1) NWP 29 (single family housing) was modified to reduce acreage limitation to 1/4

acre and required preconstruction notification for all activities;

(2) NWP 39, 40, 42, and 43 were modified to include a 300–linear foot limit for filling or excavation activities in stream beds that normally have flowing water;

came effective on June 7, 2000, and NWP 26 expired the same day. 65 Fed.Reg. 14,255.

NAHB's complaint was filed on February 28, 2000, and on March 16, 2000, the NSSGA et al. filed its complaint. The two cases were consolidated on June 15, 2000. The NFIB et al. filed its complaint on June 16, 2000, and was consolidated with the other two cases on September 12, 2000. The plaintiffs argue, *inter alia*, that the NWPs exceed the Corps' authority under the CWA because the Corps only has jurisdiction over "discharges" of dredged or fill material into "waters of the United States," the NWPs exceed the Corps' authority under the CWA because the Corps can only issue NWPs for categories of activities that are similar in nature and will cause only minimal adverse environmental impacts, the Corps did not conduct a flexibility analysis as required by the Regulatory Flexibility Act, and the NWPs violated NEPA because the Corps did not conduct a Programmatic Environmental Impact Statement.[4] On February 15, 2001, all three sets of plaintiffs filed motions for summary judgment, and the defendants and intervenors responded with cross-motions for summary judgment on June 14, 2001.

While the parties' cross-motions for summary judgment were pending, the Corps issued new NWPs and conditions on January 15, 2002. Because the NWPs were reissued, the Court initially assigned the case permitted the parties to submit supplemental complaints and pleadings. While that supplemental briefing was in progress, this case was reassigned to this Court on April 9, 2002. The parties completed their supplemental filings on August 12, 2002.

## II.  Discussion

■ The defendants contend that the Court lacks subject matter jurisdiction because the Corps' issuance of NWPs is not a final agency action. The Court concludes, for the following reasons, that the Corps' issuance of the new NWPs and general conditions, while constituting the completion of a decisionmaking process, does not constitute a "final" agency action because no legally binding action has taken place as to any given project until either an individual permit application is denied or an enforcement action is instituted.

■ Under the Administrative Procedures Act ("APA"), courts can only exercise judicial review over a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also FTC v. Standard Oil Co.*, 449 U.S. 232, 238, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980).[5] In *Bennett v. Spear*, the Supreme Court explained further that an agency action is final only if it meets two conditions: The first condition is that "the action must mark the consummation of the

---

(3) GC 25 was added to restrict use of certain NWPs in designated critical resource waters;

(4) GC 26 was added to limit use of certain NWPs to place permanent, above-grade fills in some areas of 100–year floodplains;

(5) GC 9 and 19 were modified to add additional protections of water quality, such as use of vegetated buffers and water quality management plans;

(6) GC 13 was modified to include thirty-day completeness review period of Corps' review of preconstruction notifications.

65  Fed.Reg. 12,818.

4.  Note that plaintiff NSSGA withdrew any claims relating to violations of the Tenth Amendment. *See* Notice of Filing of Additional Authorities, Nov. 4, 2003.

5.  This same "final agency action" requirement applies to actions under the Regulatory Flexibility Act ("RFA"). *See* 5 U.S.C. § 611(a)(1). Accordingly, the plaintiffs' RFA claims are not fit for judicial review for the same reasons that the APA claims are not.

agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission*, 324 F.3d 726, 731 (D.C.Cir.2003) (stating that the agency decision must be "definitive") (quoting *Standard Oil Co.*, 449 U.S. at 239, 101 S.Ct. 488) (internal quotes omitted). The second condition, which overlaps closely with the requirements for ripeness,[6] is that "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78, 117 S.Ct. 1154; *Reliable Automatic Sprinkler Co.*, 324 F.3d at 731 (stating the action must have " 'direct and immediate ... effect on the day-to-day business' of the parties") (quoting *Standard Oil Co.*, 449 U.S. at 239, 101 S.Ct. 488). In sum, an agency action is only final "to the extent that it imposes an obligation, denies a right, or fixes some legal relationship." *Reliable Automatic Sprinkler Co.*, 324 F.3d at 731 (citing *Role Models Am., Inc. v. White*, 317 F.3d 327, 331–32 (D.C.Cir.2003)).

The first condition of the finality test—that the agency action be a definite declaration of the agency's policy—is met in this case. After congressionally mandated notice and public hearings, the Corps issued general permits pursuant to Section 404(e). 33 U.S.C. § 1344(e)(1). The Corps set conditions that, if met, allow parties to discharge pollutants, exempting them from the clear-cut prohibition on discharges into navigable waters. In its own words, the Corps set forth the "Final Notice of Issuance and Modification of Nationwide Permits," 64 Fed.Reg. 47,175; 65 Fed.Reg. 12,818, and declared that the "Nationwide Permits are issued," 65 Fed. Reg. 12,885. There can be no doubt that these new NWPs constitute an "action" because review under the APA covers all sorts of agency decisions, *see Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (explaining that "final action" is "meant to cover comprehensively every manner in which an agency may exercise its power") (citing *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238, n. 7, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980)). It is equally clear that the Corp has "rendered the last word," *Whitman*, 531 U.S. at 478, 121 S.Ct. 903 (quoting *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 586, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (internal quotes omitted)), on the contours of the nationwide permitting program by establishing conclusively a pollution impact threshold below which a party can discharge pollutants without having to acquire an individual permit from the Corps. Thus the issuance of the NWPs marks the "consummation" of the agency's action as to that aspect of the Corp's duties. *Bennett*, 520 U.S. at 177–78, 117 S.Ct. 1154.

---

**6.** The second condition of the finality test is closely related to the ripeness doctrine. *See Homebuilders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers*, 335 F.3d 607, 615–16 (7th Cir.2003). To determine whether an action is ripe for review, a court must determine whether the hardship to the parties is sufficient to invite judicial consideration. *National Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 123 S.Ct. 2026, 2030, 155 L.Ed.2d 1017 (2003) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). Therefore, to the extent that any of the claims are not brought under the APA or the RFA, the Court concludes, for similar reasons, that the Corp's issuance of the NWPs does not create "real hardship[s]" or "adverse effects of a strictly legal kind" as required by the ripeness doctrine. *National Park Hospitality Ass'n*, 123 S.Ct. at 2031, 2032 (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (internal quotes omitted)).

However, just because the agency has definitively declared its policy by setting this new threshold through the NWPs does not mean that the action is necessarily final as to any given project. Indeed, the second condition of the finality test requires this Court to determine whether there are any legal consequences inherent in the agency's decision, and, if so, whether those consequences are sufficient to establish finality. Because Congress specified that the Corps "may" issue general permits, but did not require it to do so, 33 U.S.C. § 1344(e)(1), the Corps' decision, in effect, to allow certain projects to pollute if its impact is limited in geographic consequence, or if they meet other minimal conditions, does not deprive the parties whose projects exceed the pollution impact threshold set by NWPs of any right that they would otherwise have. Indeed, a party whose project will exceed an NWP threshold is not denied anything until it has exhausted all of its permit options. Thus, the general permit program, in effect, is the first step of a larger permitting process that enables the agency to streamline the overall process by limiting the pool of applicants at the front-end of the process. Those who are not eliminated simply apply for an individual permit. 65 Fed.Reg. 12,821 ("If a prospective permittee cannot comply with all of the terms and conditions of the NWPs, then he or she can request another form of Department of the Army (DA) authorization, such as a regional general permit or a standard individual permit."); 67 Fed.Reg. at 2053 (stating that if prospective permittee does not qualify for a NWP, he can request individual or regional general permit). Since the Corps determines whether to issue these individual permits on a case-by-case basis after site-specific analysis and opportunity for public hearing, 33 C.F.R. §§ 320.4, 323, a party is not legally denied anything until its individual permit is rejected.

In *Industrial Highway Corp. v. Danielson*, 796 F.Supp. 121 (D.N.J.1992), *aff'd*, 995 F.2d 217 (3d Cir.1993), a district court considered whether the Corps' decision— that Industrial Highway could not proceed under a NWP and must acquire an individual permit for its building construction— was a final decision under the APA. *Id.* at 122. The facts in that case involved a company's attempt to construct a building. After providing the Corps' with preconstruction notification, Industrial Highway was informed by the Corps that it must apply for an individual permit because a previous violation remained uncorrected. *Id.* The court concluded that the Corps' decision requiring Industrial Highway to apply for an individual permit did not have the "status of law," *id.* (quoting *Solar Turbines, Inc. v. Seif*, 879 F.2d 1073, 1080 (3rd Cir.1989)), because the Corps did not *prevent* Industrial Highway from proceeding forward with its construction. *Id.* at 127–28. Moreover, the court concluded that any purported hardship of having to comply with the Corps' individual permit program was not substantial enough for the Corps' decision to be considered a final agency action. *Id.* at 128.

Though the case here involves considerably more parties than in *Industrial Highway*, the effect is the same. The issuance of the NWPs alone does not necessarily preclude any party from proceeding with a discharge activity. To proceed with an activity, a party simply must apply for an individual permit. As the court in *Industrial Highway* explained: "The Corps has not directed [the plaintiff] to engage in any act, nor has it forbid Industrial from engaging in any act." *Id.* at 127.

Moreover, the Corps' decision to set a NWP threshold does not constitute an enforcement action against any party. By

setting a threshold for permitting purposes, it has not necessarily prohibited any party from moving forward with construction or any activity that would involve discharging pollutants. Indeed, until an enforcement action is initiated, or denial of an individual permit occurs, no "legally binding decision" has taken place. *Lotz Realty Co. v. United States et al.*, 757 F.Supp. 692, 696 (E.D.Va.1990) (quoting *Avella v. U.S. Army Corps of Engineers*, 1990 WL 84499 (S.D.Fla.1990)); *Lotz Realty Co.*, 757 F.Supp. at 696 (finding that Corps' decision requiring plaintiff to seek individual permit is not a final agency action under the APA because the plaintiff "faces no automatic, unavoidable adverse consequences as a result of the agency action"); *cf. Reliable Automatic Sprinkler Co.*, 324 F.3d at 732 ("No legal consequences flow from the agency's conduct to date, for there has been no order compelling [a party] to do anything.").

■ The defendants' argument that the delay and cost of having to apply for an individual permit, or to notify the Corps of proposed projects, is hardship enough that the NWP issuance should constitute a final agency action is inherently flawed and inconsistent with a fair understanding of the permitting process. While it is true that the delay for those applying for an individual permit amounted, on average, to one hundred days in fiscal year 1999, 65 Fed.Reg. 12,820, additional delay and cost alone have never been held to render an agency's decision a final agency action. In *Standard Oil*, the Supreme Court made clear that having to respond to further administrative requirements "is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action." 449 U.S. at 242, 101 S.Ct. 488. The administrative requirement in *Standard Oil* was an administrative enforcement hearing, and here it is the requirement that the parties apply for an individual permit. Both requirements incur additional costs and delay, but neither can be considered final agency actions. Just as in *Standard Oil*, the parties here cannot challenge the agency decision even though they incur the injuries of cost and delay; such injuries are not legally recognizable. *See also Abbott Labs.*, 387 U.S. at 153, 87 S.Ct. 1507 ("[A] possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to government action."). Simply put, there is no final agency action until a party is either denied an individual permit or an actual enforcement action ensues. *See Reliable Automatic Sprinkler*, 324 F.3d at 732 (citing *Standard Oil*, 449 U.S. at 243, 101 S.Ct. 488).

■ Finally, the Court disagrees with the plaintiffs' claim that if the Court does not exercise judicial review now, then there will never be an opportunity to do so. There is no legal authority prohibiting a party denied an individual permit from challenging a NWP's application to its individual project. That is, if a party pursuing a discharging activity—an activity that does not qualify for a NWP—applies for an individual permit and is rejected by the Corps, there is nothing that prohibits the party from challenging both the NWP's application to its project and the denial of its individual permit application. *Cf. Bragg v. Robertson*, 54 F.Supp.2d 653, 654 (S.D.W.Va.1999) (finding that the Corps' decision to require individual permit applications, instead of allowing the plaintiffs to proceed under an NWP, is not necessarily a final agency action because the plaintiffs "have not demonstrated that, once the Corps makes its final determination on the individual permit, an applicant could not challenge the decision requiring an individual permit application"). In the end, as

the Supreme Court explained clearly in *Lujan v. National Wildlife Federation*:

> Absent [a statutory provision providing for immediate judicial review], a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

Here, the time for a plaintiff to challenge a NWP is when the Corps has explicitly prohibited a party from proceeding with its desired activity and thus caused the party actual legal harm. Absent a directive from Congress instructing courts to review these specific administrative decisions, a court must wait until harm actually occurs to an applicant and review the decisions on a case-by-case basis, deferring the proposed "sweeping actions" to the branches of government better suited for such reform. *See id.* at 894, 110 S.Ct. 3177.

### III. Order

For the above-stated reasons, it is this 24th day of November, 2003, hereby

**ORDERED** that the defendants' cross-motion for summary judgment [## 60, 62] is GRANTED;

**ORDERED** that the intervenors' cross-motion for summary judgment [# 77] is GRANTED;

**ORDERED** that the plaintiffs' motions for summary judgment [## 46–48] are DENIED;

**ORDERED** that plaintiff NFIB's motion to sever case from other two cases is DENIED as moot;

**SO ORDERED.**