# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 2, 2015        Decided June 3, 2016

No. 15-5014

RHEA LANA, INC. AND RHEA LANA'S FRANCHISE SYSTEMS,
INC.,
APPELLANTS

v.

DEPARTMENT OF LABOR,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00017)

———

*Stephen S. Schwartz* argued the cause for appellants. With him on the briefs were *Matthew J. MacLean, John F. Scalia, Keith Hudolin*, and *Daniel Z. Epstein*.

*Sydney A. Foster*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Vincent H. Cohen Jr.*, Acting U.S. Attorney, *Mark B. Stern*, Attorney, U.S. Department of Justice, and *Dean A. Romhilt*, Senior Attorney, U.S. Department of Labor.

Before: GARLAND,[*] *Chief Judge*, PILLARD, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

PILLARD, *Circuit Judge*:  Plaintiff Rhea Lana's periodic tag sales of used children's toys, clothing, and furnishings—staffed principally by mothers and grandmothers as salespeople—are reminiscent of many a charitable fundraising event.  The difference is that Rhea Lana runs and franchises its sales for a profit.  The Department of Labor has for several decades read the Fair Labor Standards Act to prohibit for-profit, private-sector entities from using volunteer workers.  Consistent with that view, the Department sent Rhea Lana a letter informing it that its failure to pay its salespeople violates the Act.  The letter also bore a warning:  the Act contains a penalty provision for repeated or willful violations and, now that Rhea Lana had official notice of its non-compliance, it would be subject to willfulness penalties for any further infractions.  Rhea Lana sought pre-enforcement declaratory and injunctive relief against the Department's determination that it was out of compliance with the Act.  The district court viewed the Department's letter as analogous to agency advice letters that this court has held to be unreviewable, non-final agency action, and so dismissed the suit.

We conclude that the Department's letter to Rhea Lana is final agency action because it is more than mere agency advice.  By notifying Rhea Lana that the company was in violation of its wage-and-hour obligations, the letter rendered knowing any infraction in the face of such notice, and made Rhea Lana susceptible to willfulness penalties that would not otherwise apply.  The letter thus transmitted legally operative

---

[*] Chief Judge Garland was a member of the panel at the time the case was argued but did not participate in this opinion.

information with a "legal consequence" sufficient to render the letter final. We therefore reverse the district court's dismissal.

I.

Plaintiffs Rhea Lana, Inc. and Rhea Lana's Franchise Systems, Inc. (collectively, Rhea Lana) operate, and franchise the opportunity to operate, semi-annual consignment sales of used children's toys, clothing, and related items. Rhea Lana leases space and handles logistical matters at the events, and consignors provide the items for sale. Consignors generally receive at least seventy percent of the proceeds from their items when sold, and may also help staff the sales. Consignors who work at Rhea Lana's sales—dubbed "consignor-volunteers"—receive no pay. However, they are allowed to buy items in advance of the general public and to help sell their own items and increase their profits by, for example, favorably displaying and promoting their goods.

In January 2013, the Wage and Hour Division of the Department of Labor (DOL or the Department) began investigating Rhea Lana's employment practices. At a meeting in May 2013, the agency advised Rhea Lana that DOL considered the company's consignor-volunteers to be employees under the Fair Labor Standards Act (FLSA), entitled to wages, including back pay. In August of that year, the agency reiterated its position in a pair of letters from Robert A. Darling, a district director of the Wage and Hour Division. The first letter, dated August 6, 2013, went directly to Rhea Lana's consignor-volunteers. It explained that those workers "might not have been paid as required by the law" and that, although the agency would "take no further action on [their] behalf," the consignor-volunteers could bring suit under the FLSA to recover back pay. Letter from Robert A.

Darling to Rhea Lana Consignor-Volunteers (Aug. 6, 2013), J.A. 21.

The second letter, sent to Rhea Lana on August 26, 2013, explained that "[t]he investigation [had] disclosed violations" of the FLSA's minimum-wage and overtime provisions. Letter from Robert A. Darling to Rhea Lana Rhiner (Aug. 26, 2013), J.A. 23. The letter noted that Rhea Lana had agreed to pay back wages to thirty-nine managers it had been treating as volunteers, but that the company "refuse[d] to comply" with respect to the consignor-volunteers. *Id.* In a paragraph of particular significance for this appeal, the letter continued:

> We would like to direct your attention to section 16(e) of the FLSA and Regulations, Part 578. As you will note, section 16(e) provides for the assessment of a civil money penalty for any repeated or willful violations of [the FLSA's minimum-wage and overtime requirements], in an amount not to exceed $1,100 for each such violation. No penalty is being assessed as a result of this investigation. If at any time in the future your firm is found to have violated the monetary provisions of the FLSA, it will be subject to such penalties.

*Id.*

As DOL explained in its letter to consignor-volunteers, it had decided to conclude the matter by putting the company on notice and taking no "further action." Letter from Robert A. Darling to Rhea Lana Consignor-Volunteers (Aug. 6, 2013), J.A. 21. Rhea Lana filed suit against DOL under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), challenging the agency's determination that Rhea Lana's consignor-volunteers are employees under the FLSA. Rhea Lana sought a declaration that those workers are not

employees and an injunction barring DOL from further investigations or enforcement proceedings flowing from the agency's determination.

The agency moved to dismiss, contending that Rhea Lana lacks standing and that the challenged letters are not final agency action subject to APA challenge. The district court held that the company has standing, but that the challenged agency action is non-final. The court reasoned that the letters here are indistinguishable from other statements of agency legal opinion that this court has found non-final, such that "D.C. Circuit precedent forecloses APA review of the DOL letters at issue." *Rhea Lana, Inc. v. U.S. Dep't of Labor*, 74 F. Supp. 3d 240, 245-46 (D.D.C. 2014); *see id.* at 244-45 (citing *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003)). Rhea Lana timely appealed.

II.

We review the district court's dismissal *de novo*. *Reliable Automatic Sprinkler Co.*, 324 F.3d at 731. Agency action is final, as it must be before we may review it here, 5 U.S.C. § 704, if it satisfies two conditions: "First, the action must mark the consummation of the agency's decisionmaking process . . . . And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted).

The parties have narrowed the question at issue in two ways. First, DOL has conceded the first finality requisite: the letters completed the agency's decisionmaking on the

consignor-volunteers' status as employees. *See* Mem. in Supp. of Mot. to Dismiss 9 n.2, J.A. 65; Oral Arg. Rec. 31:50-32:04. Second, Rhea Lana has clarified that its finality contention is limited to the agency's August 26 letter to the company. *See, e.g.*, Rhea Lana Br. 3, 8-10; Oral Arg. Rec. 12:38-13:04. Accordingly, the sole question before us is whether DOL's August 26 letter (hereinafter, the Letter) satisfies the second finality requisite—that is, whether the Letter (a) determines rights or obligations or (b) creates legal consequences.

Rhea Lana says the Letter both determines obligations and creates legal consequences; either would suffice. The law in this area is hardly crisp. Our finality precedent lacks many "self-implementing, bright-line rule[s]," given the "pragmatic" and "flexible" nature of the inquiry as a whole. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (internal quotation marks omitted); *see U.S. Army Corps of Eng'rs v. Hawkes Co.*, No. 15-290, 136 S. Ct. ___, ___, slip op. at 7 (U.S. May 31, 2016) (noting "the pragmatic approach we have long taken to finality" (internal quotation marks omitted)). And "rights or obligations" and "legal consequences" may have some analytic overlap. *See, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000). We are assisted in this case by comparison of Rhea Lana's predicament to that of the plaintiffs in *Sackett v. EPA*, 132 S. Ct. 1367 (2012)—a case that, as we explain, provides helpful guideposts in discerning finality.

The company casts this case as the spitting image of *Sackett*, in which the Supreme Court found the challenged agency action to be final. The Court in *Sackett* considered the finality of an Environmental Protection Agency (EPA) administrative compliance order issued against the Sacketts,

Idaho landowners who had, without seeking a dredge-and-fill permit under the Clean Water Act, filled part of their land with dirt and rock in preparation for building a house there. *Id.* at 1370. EPA responded with an order explaining that the Sacketts' property contained wetlands under federal law, and that the Sacketts' unpermitted filling activities violated the Act. *Id.* at 1370-71.

The Court concluded that the EPA order under review "ha[d] all of the hallmarks of APA finality." *Id.* at 1371. The order directed the Sacketts "immediately to undertake activities to restore" the property, and to provide EPA with access to the site and related records. *Id.* (internal quotation marks, alteration, and citations omitted). It "determined rights or obligations" by giving the Sacketts "the legal obligation to restore their property . . . and [to] give the EPA access to their property and to records and documentation related to the conditions at the Site." *Id.* (internal quotation marks and citation omitted). And, the Court concluded, "legal consequences . . . flow[ed]" from the order because, among other things, "the order expose[d] the Sacketts to double penalties in a future enforcement proceeding"—one set of penalties for violation of the Clean Water Act, and one for violation of the compliance order itself. *Id.* at 1370, 1372.

Tracking *Sackett*, Rhea Lana contends the Department's Letter is functionally equivalent to the EPA's order in both regards. It casts the Letter as an order to comply that thus determined rights and obligations, and it asserts that legal consequences flow from the Letter because it renders the company vulnerable to future action for civil penalties. We agree only with the second contention.

8

A.

The Letter here, unlike the EPA compliance order in *Sackett*, created no new legal obligations beyond those the FLSA already imposed. The EPA compliance order commanded action to mitigate the violation the Sacketts already had committed, specifying actions the Sacketts "shall . . . undertake" in accordance with an attached Restoration Work Plan, and dictating deadlines by which they must do so. *See Sackett* Compliance Order ¶¶ 2.1-2.13, J.A. 127-29. That order contained formal and detailed findings of fact, concluded as a legal matter that the Sacketts had violated and were continuing to violate the Clean Water Act, and spoke in mandatory terms. *Id.* ¶¶ 1.1-.13, 2.1-.14, J.A. 125-29. EPA's cover letter likewise emphasized the mandatory and immediate requirements of the agency's order. *See* Letter from Michelle Pirzadeh to Chantell & Michael Sackett (Nov. 26, 2007), J.A. 123 (noting that the order "requires you to perform specified restoration activities and provide certain specified information").

Unlike the detailed terms imposed by EPA's order in *Sackett*, the Labor Department's Letter to Rhea Lana expressed the agency's "understanding that [Rhea Lana] refuse[s] to comply" with the Department's back-pay determination. Letter from Robert A. Darling to Rhea Lana Rhiner (Aug. 26, 2013), J.A. 23. The Letter restated directly to Rhea Lana the Department's longstanding view that employees of for-profit entities are subject to the FLSA's wage-and-hour provisions, and do not qualify for volunteer status. *Id.*; *see* J.A. 19-47 (advisory opinions, letters, and other agency publications confirming Department's longstanding interpretation of volunteer provisions). The Letter thus gave Rhea Lana the opportunity to take responsibility for bringing its operations into compliance; it

created no new obligation on Rhea Lana that the company did not already bear under the FLSA. Without more, the Department's "Letter tread no new ground. It left the world just as it found it." *See Indep. Equip. Dealers Ass'n*, 372 F.3d at 428.

In that way, the Department's Letter resembled, not the *Sackett* compliance order, but "the type of workaday advice letter that agencies prepare countless times per year in dealing with the regulated community." *Id.* at 427 (internal quotation marks and citation omitted); *see Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 945 n.6 (D.C. Cir. 2012). Agencies routinely use such letters to warn regulated entities of potential violations before saddling them with expensive and demanding enforcement actions. Treating such reminders of regulated parties' legal obligations as final and judicially reviewable agency action would discourage their use, "quickly muzzl[ing] . . . informal communications between agencies and their regulated communities . . . that are vital to the smooth operation of both government and business." *Indep. Equip. Dealers Ass'n*, 372 F.3d at 428. For purposes of the rights-and-obligations inquiry, the Letter is just like other forms of informal agency advice that we have time and again treated as unreviewable.

B.

The heart of this case is Rhea Lana's second argument—that legal consequences flow from the Letter because it makes Rhea Lana eligible for civil penalties in any future enforcement action. Among the enforcement mechanisms the FLSA authorizes is DOL's assessment of civil penalties for certain "willful" violations of the Act's minimum-wage or

overtime provisions. 29 U.S.C. § 216(e)(2).[1] Rhea Lana argues that, as a direct result of the notice provided to it by the Letter, the Department may treat its continued nonpayment of consignor-volunteers as a willful violation of DOL's regulations, thereby subjecting the company to civil penalties. That new exposure to civil penalties, Rhea Lana maintains, constitutes a legal consequence that renders the Letter final agency action.[2] DOL counters that Rhea Lana misreads the agency's regulation and misunderstands finality. For the reasons set forth below, we agree with Rhea Lana.

The FLSA provides that employers that willfully violate the Act's minimum-wage or overtime provisions "shall be subject to a civil penalty not to exceed $1,100 for each such violation." 29 U.S.C. § 216(e)(2). The Department of Labor promulgated 29 C.F.R. § 578.3 to flesh out, among other

---

[1] The statute provides for civil penalties for repeated as well as for willful violations, and Rhea Lana contends that the Letter also exposes it to penalties as a repeated violator in future enforcement proceedings. As we base our conclusion here on the potential for willful-violations penalties, we need not consider the Letter's possible consequences with respect to repeated-violation penalties.

[2] The focus of this litigation has been the Letter's implications for civil penalty assessment, but a finding of willfulness may precipitate additional legal consequences. The statute of limitations for a civil action against an employer is generally two years, but a civil action challenging a willful violation may be brought within three years. *See* 29 U.S.C. § 255(a). And, because courts have discretion to deny liquidated damages only where an employer can show its conduct "was in good faith and that [it] had reasonable grounds for believing that [its] act or omission was not a [statutory] violation," *id.* § 260, a court faced with a willful violation may be required to award liquidated damages.

things, what constitutes a willful violation.[3] *See Minimum Wage and Overtime Violations; Civil Money Penalties*, 57 Fed. Reg. 49,128 (Oct. 29, 1992). Subsection (c)(1) of that regulation dictates that a violation "shall be deemed to be 'willful' . . . where the employer knew that its conduct was prohibited by the Act or showed reckless disregard for the requirements of the Act." 29 C.F.R. § 578.3(c)(1). Subsection (c)(2), in turn, provides that "conduct shall be deemed knowing, among other situations, if the employer

---

[3] The regulation's willfulness provision states in full:

(c) Willful violations.

(1) An employer's violation of section 6 or section 7 of the Act shall be deemed to be "willful" for purposes of this section where the employer knew that its conduct was prohibited by the Act or showed reckless disregard for the requirements of the Act. All of the facts and circumstances surrounding the violation shall be taken into account in determining whether a violation was willful.

(2) For purposes of this section, an employer's conduct shall be deemed knowing, among other situations, if the employer received advice from a responsible official of the Wage and Hour Division to the effect that the conduct in question is not lawful.

(3) For purposes of this section, an employer's conduct shall be deemed to be in reckless disregard of the requirements of the Act, among other situations, if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry.

29 C.F.R. § 578.3(c).

received advice from a responsible official of the Wage and Hour Division to the effect that the conduct in question is not lawful." *Id.* § 578.3(c)(2).

In its Letter to Rhea Lana, the Department recounted the regulation's provision for repeated or willful violations of minimum wage or overtime obligations, advising that, although "[n]o penalty is being assessed as a result of this investigation," Rhea Lana "will be subject to [the FLSA's] penalties" if it "at any time in the future . . . is found to have violated the monetary provisions of the FLSA." Letter from Robert A. Darling to Rhea Lana Rhiner (Aug. 26, 2013), J.A. 23. Thus, if Rhea Lana continued not to pay consignor-volunteers after it received the agency's Letter, its conduct would constitute a willful violation under that regulation, at least as the agency interpreted it in the Letter.

The parties agree that Darling was "a responsible official" within the meaning of the regulation. Oral Arg. Rec. 8:15-24 (Rhea Lana); *id.* at 17:55-59 (DOL). And there is no dispute that the Letter contains "advice" that Rhea Lana's non-payment of consignor-volunteers was "not lawful." 29 C.F.R. § 578.3(c)(2). The parties now part ways over the meaning of the regulation's reference to violations that "shall be deemed" to be willful. *Id.* The regulation uses "the mandatory 'shall' [which] . . . normally creates an obligation impervious to judicial discretion." *Shapiro v. McManus*, 136 S. Ct. 450, 454 (2015) (internal quotation marks and citation omitted); *see Cook v. FDA*, 733 F.3d 1, 7 (D.C. Cir. 2013) (citing "case law [that] provides ample support" for the principle that "the ordinary meaning of 'shall' is 'must'" (internal quotation marks omitted)). The regulation's statement that conduct "shall be deemed knowing," 29 C.F.R. § 578.3(c)(2), and thus willful, *id.* § 578.3(c)(1), upon a showing of unheeded prior advice from a responsible official

appears to require a finding of willfulness in a case like this one.

The exposure to willful-violation penalties apparently resulting from receipt of such advice would be a legal consequence within the meaning of *Bennett v. Spear*, just as exposure to double penalties made EPA's compliance order legally consequential in *Sackett*. The Supreme Court's decision this week in *Hawkes* further supports that result. There, the Court concluded that jurisdictional determinations issued by the Army Corps of Engineers have legal consequences under *Bennett*, because negative jurisdictional determinations "limit[] the potential liability a landowner faces for discharging pollutants without a permit," while positive determinations "den[y] . . . [a] safe harbor" from administrative enforcement proceedings. *Hawkes Co.*, 136 S. Ct. at ___, slip. op. at 7. The DOL letter at issue here, like the jurisdictional determination in *Hawkes*, has the kind of "direct and appreciable legal consequences" on potential liability that count for purposes of finality. *Id.* at 6 (internal quotation marks omitted).

The Department urges a different reading of § 578.3(c), however, arguing that subsection (c)(2)'s mandate is tempered by subsection (c)(1)'s directive to consider "all facts and circumstances," such that unheeded advice is just one circumstance that may be considered in evaluating—but is not dispositive of—willfulness. The Department contends—for the first time at oral argument—that we owe deference to its current reading of the regulation. Oral Arg. Rec. 36:05-12. As a general matter, an agency's interpretation of its own regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). But "this

general rule does not apply in all cases." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012). Such deference is unwarranted "when it appears that the interpretation is nothing more than a convenient litigating position, or a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack." *Id.* (internal quotation marks, alteration, and citations omitted).

The Department concedes that, before this case, it had not taken the position that unheeded advice should be treated as merely one piece of evidence in a totality-of-circumstances inquiry regarding willfulness. Oral Arg. Rec. 34:34-39, 35:21-38; *see, e.g.*, 57 Fed. Reg. at 49,129 ("It is the view of the Department that where an employer acts contrary to advice that the employer has received from the Wage and Hour Division, such action cannot be deemed merely negligent, but rather constitutes a willful act."). In this very case the Department informed Rhea Lana that its advice sufficed to trigger willfulness penalties. *See* Letter from Robert A. Darling to Rhea Lana Rhiner (Aug. 26, 2013), J.A. 23. And, despite the First Circuit's "urg[ing]" that the Department alter its regulation to adopt the position it presses here, *see Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 681 n.16 (1st Cir. 1998), the Department has not done so. Accordingly, the interpretation the Department presents in this litigation does not qualify for *Auer* deference.

Contrary to the Department's position in this appeal, the regulation's "interrelated and closely positioned" provisions are most readily harmonized by treating the specific directive in subsection (c)(2) as "control[ling] over [the] general provision" of subsection (c)(1). *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981). While all facts and circumstances ordinarily should be considered, the regulation specifies that a particular circumstance—an unheeded agency

warning—itself reflects willful misconduct. *See Davila v. Menendez*, 717 F.3d 1179, 1185 (11th Cir. 2013) ("An employer knowingly violates the Act if he disregards the minimum wage laws deliberately or intentionally . . . such as by ignoring 'advice from a responsible official . . . that the conduct in question is not lawful.'" (quoting 29 C.F.R. § 578.3(c)(2)) (additional citation omitted)); *see also W. Ill. Home Health Care, Inc. v. Herman*, 150 F.3d 659, 663 (7th Cir. 1998). *But see Baystate*, 163 F.3d at 680-81.

The Department also argues that treating notice as dispositive of willfulness is inconsistent with the Supreme Court's decision in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). In support, the Department cites an "incongruity" the First Circuit identified between *Richland Shoe*'s willfulness standard, and subsection (c), on the ground that the latter—at least as Rhea Lana reads it here— "precludes legitimate disagreement between a party and the Wage and Hour Division about whether the party is an employer covered by the Act." *Baystate*, 163 F.3d at 680. Whether the First Circuit's position ultimately prevails on its merits, it is not dictated by *Richland Shoe*. The Court in *Richland Shoe* rejected a willfulness standard for statute-of-limitations purposes "that merely require[d] that an employer knew that the FLSA was in the picture" in favor of a reading of "willful" that required "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." 486 U.S. at 132-33 (internal quotation marks and citation omitted). But that latter standard is precisely the one the Department of Labor appears to have adopted in its general definition of willfulness in subsection (c)(1), at issue here. An employer who has received advice from DOL that its conduct in particular violates the FLSA certainly knows more than just that the FLSA is "in the picture."

In deciding that the Department's action is final, however, we need not opine definitively on § 578.3(c)'s meaning. It suffices for present purposes that the regulation is capable of a reading rendering the Letter a stand-alone trigger for willfulness penalties and that, notwithstanding its contrary position in this appeal, the Department took that view in its Letter to Rhea Lana; it gave no indication that other facts and circumstances could mitigate the stated effect of the company's receipt of the Letter. *See* Letter from Robert A. Darling to Rhea Lana Rhiner (Aug. 26, 2013), J.A. 23. In *Sackett*, the Court likewise found a legal consequence where the Government took the position that the order at issue "exposes the Sacketts to double penalties in a future enforcement proceeding," 132 S. Ct. at 1372, without "decid[ing] . . . that the Government's position is correct, but assum[ing] the consequences of the order to be what the Government asserts," *id.* at 1372 n.2. We can take the Department at its word to the regulated party that § 578.3(c) renders the Letter legally consequential, leaving the parties to litigate on remand the merits of the regulation's import. *Cf. W. Ill. Home Health Care, Inc.*, 150 F.3d at 663 (holding DOL advice letter final where letter "warned that [companies] would be treated either as recidivists or as willful violators if they failed in the future to comply with the legal ruling contained in the letter, thus subjecting them to penalties").

Finally, the Department suggests that penalties are too contingent to constitute the type of legal consequence necessary to confer finality. The Letter itself does not assess penalties; in order for the agency to do so, it would have to (a) bring a civil action against Rhea Lana, and (b) persuade the adjudicator that Rhea Lana violated the FLSA. But that is the situation the Supreme Court confronted in deeming the order at issue in *Sackett* to have legal consequences: the Sacketts "could be subjected to monetary sanctions for

violating the order only if (a) EPA commenced [an] enforcement action against petitioners, and (b) the court in that suit determined that [the] petitioners had violated the [Clean Water Act] as well as the order." Brief for the Respondents at 11, *Sackett*, 132 S. Ct. 1367 (No. 10-1062), 2011 WL 5908950, at *11. The possibility that the agency might not bring an action for penalties or, if it did, might not succeed in establishing the underlying violation did not rob the administrative order in *Sackett* of its legal consequences, nor does it do so here. *See Sackett*, 132 S. Ct at 1372. By rendering Rhea Lana a candidate for civil penalties, the Department's Letter establishes legal consequences and is, accordingly, final agency action.

The Seventh Circuit reached the same conclusion in reviewing a similar Department of Labor letter, *see W. Illinois Home Health Care, Inc.*, 150 F.3d at 663, and that holding is consistent with our own finality precedent. To be sure, we have repeatedly held that agency action is not final if the adverse effects of the action depend "on the contingency of future administrative action." *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (internal quotation marks and citation omitted); *see also Am. Airlines, Inc. v. Transp. Sec. Admin.*, 665 F.3d 170, 174 (D.C. Cir. 2011); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006). None of those cases, however, involved a regulation that the agency read to invest challenged agency action with legal effect. Even without future administrative enforcement, the Letter, together with subsection (c)(2), may have already rendered Rhea Lana susceptible to civil penalties for violations that, in the absence of the Letter, could be treated as non-willful and ineligible for any such penalties.

18

\* \* \*

For the foregoing reasons, we reverse the order of the district court and remand for further proceedings.

*So ordered.*